Good morning, your honors. Katie Hrolbrink on behalf of Mr. Palacios. Before Mr. Palacios's trial, Agent Painter cracked into his phone and took photographs of text messages he found there. He memorialized his actions in a formal certification. Agent Pham then related the Not only was that testimony the only evidence linking Mr. Palacios's phone to the text messages, it was also the only evidence linking the text messages to other evidence of identity on the phone, like the Facebook page or the contact listing. Can I ask you a foundational question right here? Yes. It's a little hard for me to understand on the record. This exhibit that was marked, the declaration, the certification that you're just referring to right now, is marked as that right? That's exactly correct, your honor. Okay. All right. So go right ahead. That's correct. But Agent Pham did relate the contents of that certification, and your honors have said that that's the Sixth Amendment equivalent of having submitted it into evidence. In the course of that, that's how I read the records. Essentially, one agent was on the stand sort of reading the contents or relaying the contents of this declaration, and the declaration wasn't admitted, right? That's correct. Okay. So I would like to know more specifically, please, at ER 511, page 2 of the declaration, this is Agent Painter then. His statement was, I was present or within proximity during the extraction. Did Agent Pham tell the jury that? Your honor, I'm not sure that he said that in so many words, but he did say that Agent Painter retrieved the phone from a secure vault, that he obtained screenshots of content from the phone using an external camera. So he linked Agent Painter's actions to sort of the retrieval of these photos from the phone. All right. So the first contested issue between the parties is whether these photographs are testimonial. They plainly are under Bullcoming and Melendez-Diaz. The formalized certification that Agent Painter submitted is within the core class of testimonial statements defined by those cases. Melendez-Diaz tells us there's only one narrow exception to that core class, and that's simply when a certification introduces a business or public record. The photos of evidence taken during a law enforcement investigation for use at trial here are not business or public records. They're not kept by a neutral custodian. They're made for the purposes of litigation. They do not fit that. Counsel, if we agree that those, that, I guess, recounting of Special Agent Painter's actions violated, if it's plain error, and it's error that is plain, and if we agree that those were testimonial, right, then could you go to the third part of the plain error test and tell me why you think there wasn't otherwise sufficient evidence for a conviction here? Yes, Your Honor. And so I think the government has a couple of points. First, the government basically says that other evidence could have linked the text messages to Mr. Palacios, showing that he was the one who sent or received those messages. You know, Counsel, I don't mean to interrupt your answer, but, I mean, yes, you might have a point on the text messages, but in terms of harmless error, the truck had, like, 250 pounds of THC, and there was testimony that it took up so much space in the gas tank that the fuel gauge would not have shown the correct reading and that, essentially, a jury would have had to have known, or a jury could have inferred that a driver would have had to have known that something was going on that either he knew about or was deliberately ignorant as to. So how does that factor into the harmless error, even if you're right on the linking the text messages? So we agree there was certainly sufficient evidence for a jury to find that, but the plain error test asks whether there was even a reasonable probability for the jury to acquit Mr. Palacios, and that's less than a certainty, less even than a likelihood. This Court has drug value type and amount is not itself dispositive when it comes to harmless error. And here, even though the government had some points in its favor when it came to the car experts, we had some points in our favor, too. We had an expert who testified that the lock on one of the doors was punched out, that there was signs of tampering. He saw some scratches that he thought could have been a sign of tampering. He also took a video where he just took a normal screwdriver, put that screwdriver in the ignition, and turned and was able to start the car. And so with all of those facts together, our argument was that somebody could have broken into Mr. Palacios' car, taken it perhaps in the night, put these drugs in, and been able to retrieve them likewise on the other side. 240 pounds. Yes, Your Honor. And there was testimony about exactly how long that would take, how long it would take one person, how long it would take four people. And for example, if this were to happen overnight, it's not implausible that that could happen and the car be returned. Counsel, I have a question about Exhibit 47. It's a contacts page that was admitted, and it says, me, and Ramon Palacios, right? And then the next page says, me, and it says Umberto with a phone number. I think that was used for the text. So was there testimony about that being a nickname or what is that? So Your Honor, the problem with using those exhibits to link Mr. Palacios to the text messages is that those exhibits, too, the entire foundation for them was laid through Agent Painter. Can you back up and answer my first question first, if you would? Oh, I'm sorry. That's all right. I just want to make sure we have a clear record. It's Exhibit 47? Yes. It's the contacts page that says, me, and this says Ramon Palacios. So this is your client, yes? I'm sorry, Your Honor. I'm trying to pull it up. Sure. But I agree there's definitely a picture. It's SDR 23, if that helps you with your recognition. Yes. But yes, there is a picture. Okay. So it's the next page, SDR 24, that also says, me, and there's Umberto there? Yes, Your Honor. I'm trying to figure out, is that your client? Or was there any dispute that that's your client there? I believe that it matches his middle name. And so I think the government's inference was that it was him. But there was no extra that I recall any testimony saying he went by Umberto or anything like that. Got it. Okay. And you were explaining your response. Your broader response is that these were not connected, or what were you saying? Yes, Your Honor. That Agent Painter's declaration is what actually was able to lay the foundation for all of these exhibits. So, you know, he was able to say, critically, that these exhibits came from the same phone as the text messages. And that may seem like a small thing, but it's not. Well, but the jury was left with... This is a kind of a funny record for us, and your objection is quite specific. But I think they had on the witness stand, Agent Pham, who was the arresting, investigating agent. So he testified he seized the phone, right? They had that. And then I think, per your briefing, these other exhibits that were admitted were before the jury. And your questioning, when we talk about harmless error, I think you're saying that the jury wouldn't have been able to tie these sort of free-floating exhibits to your client. Is that your argument? The free-floating exhibits to the text messages. The free-floating exhibits to the text messages. So I think the inference that the government is trying to ask the jury to draw here in this hypothetical is that they would basically say, look, we found this phone. The phone had some text messages. We were then able to go into the contacts of this same phone and find a contact that said, me, Humberto. Therefore, we can determine that the ownership of the phone fell to Mr. Palacios, and therefore, we can understand that these text messages also came from Mr. Palacios. But there is no evidence without this declaration that these two things came from the same phone. They're just two photographs with no context. So could you look at Exhibit 53 for me, please? That's the summary. Let me see what it's called. I have it up, Your Honor. Oh, thank you. Forgive me. I can't quite see the title of it, but it's Exhibit 53. So this is a summary of the text messages, right? And if you scroll through it, don't they line up? With the text, with the crossings, Your Honor? So the government does say that there are some places where they line up. Obviously, some of them are going to line up with crossings. Other crossings are not going to happen, or other of them occur at times when there are no crossings. On the left-hand column, sorry, the second column from the left, it does say Ramon Humberto Palacios. So I think this is where the middle name comes in, Humberto? Yes, Your Honor. Okay. And then I think when you're talking about the crossings over the border, you're reading in the columns to the right, yes? And you think some of them don't line up? Is that right? Well, Your Honor, so the government's two examples, just to sort of reduce it to a couple of examples. The government says that Mr. Palacios texted someone the day after he crossed, talking about deliveries and payment, so this is like a 24-hour gap, and then also was able to receive a text nine minutes before he crossed at a different time. But recall that without agent Painter's testimony, there is no evidence in the record about where, like there's no location data. So these texts, if you don't already have them linked to Mr. Palacios, could have come from any phone, from any person in the entire world. They aren't linked to the border region. They're not linked to California. They're not linked to North America. And so in that situation, I think the defense would have strong grounds to argue that these kind of vague correspondences could be a coincidence. Wasn't that an argument made at trial? No, Your Honor, because at trial, because these text messages were found on a phone that was found on Mr. Palacios, and the government was able to prove that through agent Painter's declaration, it was pretty hard to argue that these weren't his texts. All right. Thank you, Your Honor. Thank you, counsel. Please the Court, Zach Howe on behalf of the United States. Judge Christin, you had two lines of questioning I wanted to pick up on both of them. The first related to the certificate not coming into evidence. That's true. And I think that point actually shows why, even if you agree with everything my friend on the other side said, these text messages were still going to come into evidence. And the reason is because the government, pre-trial on its motions in limine, outlined exactly what it would do. This is at page 11 and 12 of the supplemental excerpts of record. It says, we are going to rely on the unadmitted certificate to authenticate the admitted text messages. And it cited this court's case which approved that procedure. But we're not talking about authentication here, right? We're talking about a different problem, which is the opportunity to cross-examine. So the point being, Your Honor, is that even if there was a lack of ability to cross-examine based on relaying the, you know, contents of the certificate. Well, there was, right? You're saying even if, but I don't see one. Is that, did you intend to qualify that statement? So I think there's an argument that what Agent Pham relayed from the certificate was not, in fact, testimonial communications. Okay, if I don't agree with you on that, what's your next best shot? The next best shot is that through all that testimony out, these text messages are still going to come into evidence. And the reason is conceded. It's conceded below and on appeal. So again, the government said, we're going to use the unadmitted certificate to authenticate these text messages. At page 45 of the record, at the motion in limine hearing, defense counsel says, we have no objection to the government utilizing that process. So certificate doesn't come in. Text messages do come in based on that authentication. Then at footnote three of the reply brief, on appeal, they again confirm that they are not challenging that authentication. Now, of course, authentication under 901A is, you know, the item is what the proponent claims that it is. Here, the government all along claimed that these were a concession to authentication both below and here. So there is no world in which these text messages don't come into evidence, even if you agree that that testimony from Agent Pham was improper. And then the second point I think you raised related to the contents of the messages themselves and the testimony and the text records and how it all lines up, the court was absolutely entitled to consider the content of the messages themselves. That's rule 901B-4. And the content of the messages included the exhibit you mentioned at SER 24, which had the name Umberto. That's Palacios's middle name. And then the case agent at page 18 and 19 of the record actually testifies that that photo in that exhibit is Palacios. And then you can line that photo up with all the text messages, beginning at page 580 of the record, and that same photo is there. So this is a photo of Palacios in the text messages that the agent has identified as him. And when you said agent and case agent, just to be clear for the record, you're talking about Agent Pham, who was the investigating agent who seized the phone, physically seized it at the border. Yes. Physically seized it and he conducted the post-arrest interview. So he had obviously seen Palacios. So then he was able to say that photo is of Palacios. And then of course there are the text records. And my friend on the other side is right. You know, there are times when they're having discussions when there aren't border crossings. But by and large, when there are border crossings, the text messages line up with them, including the penultimate text message nine minutes before Palacios crosses the border where he's asked, what are you waiting for? So I think given the messages themselves, given the identification by the agent, and given the border crossings, there's no way that a jury is going to look at these text messages and say, well, they say his name, they have his photo, they line up with his border crossings, but it's probably not his text messages. So I think, again, even if you agree with everything my friend on the other side is saying, and even if you don't rely on the unadmitted 902.14 certificate, then you still have all of that evidence that came in showing that these are, in fact, messages from Palacios. Now, I'll do my best to address the merits of the actual testimony, and you may disagree with me, but I do think because we are on plain air, the question is, do you have authority that is clear and obvious showing that relaying that content of Agent Painter's certificate amounted to testimony implicating the confrontation clause? My friend on the other side is absolutely right that much of that resembles the sort of statements found to be testimonial in Volkoming and Melendez-Diaz. But I do think it's important to note that in ANECWU, you also had statements that were very similar to the ones in Volkoming and Melendez-Diaz. And there you were dealing with certificates authenticating business and foreign records. We're not claiming that this is a business or a foreign record, but the significance of that case is that these certificates talked about when and by whom and for what purpose the records were created. So it said that these are created by someone with knowledge in the regular course of business, as part of the business's regularly conducted activities, at or near the time of the events. All of those statements resemble statements like those in Volkoming and Melendez-Diaz, and yet the court said that's not testimonial because ultimately all they're doing is certifying a business record which itself is not testimonial. Well, here I think by analogy, you can at least make the case that the bottom line of all of those statements in Agent Painter's certificate is just to authenticate a copy of a cell phone. And that's very different than what was happening in Volkoming and Melendez-Diaz. There you weren't just copying something. It wasn't that substance gets copied into another substance. It was that you had a test that was identifying what is the drug at issue or what is the blood alcohol content. That's testing and interpreting. That's very different than a copy. And so on plain error review, I don't think it's clear and obvious that this falls into the Melendez-Diaz and Volkoming bucket, as opposed to the clerk's certificate and Inequa bucket. And that's all you need for plain error review. Maybe on de novo review you would disagree with me, but I think on plain error review it's not clear and obvious. Again, I don't think the court needs to reach that question. I think the clearest path to affirmance is based on what's already been conceded as appropriate grounds to authenticate these were in fact messages from the phone. And then Judge Bennett, the final point is that I think you rightly note that even if you throw out the text messages, you're still left with the amount of the drugs, the value of the drugs, and the mechanic's testimony. And while there was some dispute on whether the car had been broken into, there was no dispute that the amount of the gas tank space that would have been taken up was nearly 100%. Yeah, I mean, to me, the quantity of the drugs, you know, has a certain compelling value, but added to the testimony that this is filling up the gas tank, and that you could only put in a very small amount of gas, and that the jury would have to conclude not only did the defendant not know the drugs were in the car, but that was, had no idea that there was some, this strange thing with the gas tank that someone, and that someone had used this method without the defendant's knowledge. I think that's right, and the logical inference is if he doesn't know, then he's either going to run out of gas before he gets where whoever put it in the car is going to want him to go, or he's going to try and fill his car up with the jiggies up. So I think that's compelling evidence. And then the final point, you know, on the dispute about the car being broken into, our auto experts said that the car had not been broken into. Their experts said it was possible it had been broken into, but then in cross-examination, he said if it had been broken into, you would have expected to find the lock inside the door paneling, and he said he looked and he couldn't find the lock. So again, I think even on that debate, our evidence had the better of it, but there was no explanation for the gas tank and some of the other evidence I've discussed. So I think for all of those reasons, even if you disagree with us on the first two prongs of plain error, you should at least agree on the third prong. And I'd ask the court to affirm, and if the court has no other questions. I have a question. Absolutely. You mentioned anequo at some length, and I think it's your, you're relying on it as your best argument for this not being testimonial. But anequo, I think in that case, it's specifically limited itself to exhibits that were not prepared evidence. It was not prepared for trial, and these exhibits clearly were. That's why I read anequo very differently. Do you want to respond to that? Sure. So I think anequo deals both substantively with the business and foreign records, and then the certifications that authenticate the business and public records. When it's dealing with these certifications, I don't think there was any dispute that these certifications were prepared in anticipation of litigation. But the court is invoking the exception noted in Bullcoming and Melendez-Diaz for clerk certificates. And in Melendez-Diaz, the court expressly says that a clerk certificate is prepared for litigation, but because all it's doing is authenticating a copy, it nevertheless is non-testimonial. Right. But the reason you've got a serious Bullcoming, Crawford problem, isn't it, is that what you're trying to get in is painter's testimony. And those exhibits that came in, and his photos taken by using the cell bright, all of that was prepared for trial. And in this case, the certification was as well. There's nothing there that wasn't prepared for trial. The text messages themselves and the calls and all of that was not prepared for trial. They were extracted. The evidence was extracting that from the phone. And what we have in the declaration, I don't mean to interrupt, but if you can speak to the issue, it seems to me that the certification, in fact, even if it had been admitted or completely read, what it says is that he was present or in proximity when the texts were extracted. So I can't even tell if he did it himself. I think the answer is yes, based on the rest of the certificate where he talks about taking the phone out of the vault and the rest of what happened with the different extractions and taking the pictures. I may be wrong, but I'm pretty sure he was the one doing all of this. My point is just that it seems like there was fertile ground for cross-examination there, and there was not an opportunity to cross-examine here. So let me just, I know I'm out of time. I'll just make two brief points. I think one is that the messages themselves were created by Palacios. They weren't created for litigation. All the agent did was pull them off the phone. So I think that's analogous to creating a copy. But the second point is that I think the rules provide a safeguard to deal with this situation. So Rule 902.14 says that if you want to use the certificate, you have to comply with Rule 902.11. Rule 902.11 says you have to give advance notice so that the opponent has a reasonable opportunity to challenge the certificate. If they had challenged the certificate, then I think that very well could have resulted in either having to admit the certificate or calling Agent Painter himself. But the fact that we had a concession, that they agreed we could utilize this process, I think is why you never had these challenges that you're talking about. But I think the rules take into account that situation. Thank you. Thank you. Thank you, counsel. I'll give you another minute. Your Honors, I would like to start with the idea that we conceded, essentially, that these, by not objecting to 902.14, we conceded that these messages were Mr. Palacios's messages. Not so. 902.14 makes very clear that it only goes to whether the government has to introduce additional evidence in order to prevent, to keep from drawing an authentication objection. The commentary says it doesn't go to confrontation. It doesn't go to relevance. And here, the government used the content of this message to lay the entire foundation for these text messages. Additionally, I think the government has placed a lot of emphasis on this Umberto picture. But critically, that is not a part of the text messages. It is a separate picture. It's a separate exhibit. And without Agent Painter, there is no evidence that that came from the same phone as the text messages. Thank you, Your Honors. Thank you very much, counsel.
judges: WARDLAW, CHRISTEN, BENNETT